RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NIKOLAY M. KOLOV,

*Petitioner,*

*v.*

MERRICK B. GARLAND, Attorney General,

*Respondent.*

⎤
⎟
⎟
⎬   No. 22-3760
⎟
⎟
⎦

───────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 077 003 118.

Decided and Filed:  August 18, 2023

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:**  Michael E. Piston, PISTON AND CARPENTER P.C., Troy, Michigan, for Petitioner.  Jeffery R. Leist, Anthony C. Payne, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GIBBONS, J., delivered the opinion of the court in which LARSEN and MURPHY, JJ., joined.  MURPHY, J. (pp. 15–25), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

JULIA SMITH GIBBONS, Circuit Judge. Nikolay Kolov, a native and citizen of Bulgaria, petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming an Immigration Judge's ("IJ") denial of withholding of removal and protection under the Convention Against Torture ("CAT").  The BIA upheld the IJ's determination that Kolov did not

present a credible claim because parts of his testimony before the IJ were not disclosed in his reasonable fear interview, written application, or supporting declaration. Because the BIA's decision contains no legal error, we deny the petition for review.

I.

Nikolay Kolov first sought admission to the United States in 1999. He was placed in removal proceedings but sought asylum and related protections. After he failed to credibly demonstrate eligibility for protection, Kolov was ordered removed. The BIA denied Kolov's appeal, and we denied his petition for review. Kolov was removed to Bulgaria in February 2012.

In November 2014, Kolov reentered the United States and was apprehended by DHS. Kolov's prior removal order was reinstated, but he expressed fear about returning to Bulgaria. Consequently, he was interviewed in January 2015 to determine whether he reasonably feared persecution in Bulgaria. In this interview, Kolov indicated that he was a member of the "Roma" ethnic group. CA6 R. 7-2, Reasonable Fear Questions & Answers, Admin R. 578, 581. Based on his ethnicity, Kolov reported that he had been subjected to harassment, abuse, and physical violence in Bulgaria.

To illustrate his claim, Kolov recounted several incidents of such treatment. He recalled that government officials made derogatory comments about his ethnicity at the airport when he returned to Bulgaria in 2012. Kolov also reported that in September 2014, two men recognized him as Roma and attacked him while he waited in line to pay for breakfast. The assailants hit Kolov, causing him to fall to the ground, and the men then repeatedly kicked him. Kolov noted that police officers were standing nearby when the attack happened and did not intervene or render aid, so he did not report the incident because he believed that the police were not interested in protecting the Roma.

Kolov also described two incidents from June 2014. In the first, he was waiting at the bus station with other Roma, and a group of Bulgarians came over and said that "Roma's [sic] didn't deserve to be living." *Id.* at 580. Kolov ran, but one of the other Roma individuals was kicked. Kolov reported the incident to the authorities, but no police action followed. In the second incident, Kolov attempted to call a taxi while out shopping, but people at the taxi stand

called him an ethnic slur and said that he had no right to shop at the store. *Id.* at 580. Kolov jumped into a taxi to escape. Kolov submitted a written police report about the interaction, indicating that he had been verbally harassed based on his race and believed that he would have been physically attacked if he had stayed at the scene. According to Kolov, the officer threw his written report into the garbage, saying that it was not enough to file a complaint.

At the end of the interview, the interviewer asked Kolov whether "there [is] any other information regarding your request for withholding of removal that we did not discuss?" *Id.* at 584. Kolov responded, "No." *Id.* Then, the asylum officer summarized the incidents that Kolov had described and asked Kolov whether the summary was correct. Kolov responded, "Yes." *Id.* at 585. Based on the information that Kolov provided, the asylum officer determined that he presented a reasonable fear of persecution or torture and referred his case to an immigration judge for withholding-only proceedings.

In the lead-up to his hearing, Kolov submitted a Form I-589, an application for withholding of removal, prepared with the help of counsel in May 2015.[1] Kolov's application claimed that he experienced "discrimination and mistreatment" in Bulgaria based on his "Roma ethnicity." CA6 7-2, Application for Asylum and for Withholding of Removal, Admin. R. 518. Kolov listed the same incidents that he described in his interview—mistreatment by Bulgarian immigration officials at the airport, harassment and threats at a bus stop, verbal abuse and threatening behavior while out shopping, and an assault while waiting to pay for breakfast. Kolov noted that the police did not respond to his complaints. He indicated that he feared continued mistreatment based on his Roma ethnicity if he returned to Bulgaria.

In a declaration attached to his application, Kolov provided additional details about the incidents of mistreatment identified in his interview and Form I-589. For the first time, however, Kolov also described an incident from November 2013. He explained that he and friends had left a restaurant when four Bulgarian men began harassing them for being Roma. One of the men spit on Kolov and tried to punch him, causing Kolov to trip and fall to the ground as he

---

[1]Kolov later submitted an updated Form I-589 form, but the only change on the new form indicated that Kolov was now married.

attempted to avoid being hit. While he was on the ground, the four men repeatedly kicked Kolov, causing Kolov's nose and lip to bleed. Kolov went to the emergency room but was told that his injuries did not require treatment. Despite Kolov's initial intent to do so, his friends convinced him not to report the incident to the police because they believed that the report would be ignored.

At his May 2019 hearing before the IJ, Kolov was represented by counsel and testified in English.[2] At the outset of his testimony, Kolov stated that he is Roma and suffered harm in Bulgaria due to his ethnicity. When probed about specific incidents of harm, Kolov described his interaction with immigration officials at the airport in 2012, the incident at the bus station in June 2014, and the attack in the breakfast line in September 2014.

Kolov also spoke about the November 2013 altercation—the one mentioned for the first time in his declaration—that began as he and friends were leaving a restaurant. His account matched his declaration; one of the assailants spit on him and tried to punch him, Kolov fell while trying to avoid getting hit, and the attackers repeatedly kicked him while he was on the ground. He went to the emergency room to seek care but was told that he did not have injuries serious enough to require treatment.

Additionally, Kolov recounted an incident from May 2012, claiming that he and his cousin were called derogatory names, pushed to the ground, and kicked. Kolov's nose began bleeding from the attack, so he went into a coffee shop to clean his face before returning home. The hearing was the first time that Kolov disclosed this incident; he had not mentioned it in his interview, Form I-589, or declaration.[3]

---

[2]An interpreter was present at the hearing but served only as a backup.

[3]In addition to his own testimony, Kolov offered other evidence at the hearing. Kolov's wife, Ventasuava Yosef, also testified at the hearing, relaying that she noticed that Kolov had bruises on several occasions during video calls when he was in Bulgaria without her. Yosef testified that Kolov made excuses for the bruising while on the calls but later admitted that they resulted from ethnicity-based attacks. Kolov also submitted statements from family and friends, news articles, and country condition materials.

In its questioning of Kolov, the government asked why he did not mention the November 2013 attack in his interview or the May 2012 attack in his interview, application, or declaration. Kolov responded that he was nervous and under stress during his interview and that the progression of the conversation prevented him from fully disclosing every incident of persecution. As for his application and declaration, Kolov claimed that he could not include everything in his written materials. When pressed, he admitted that he did not know why he failed to mention these incidents.

In June 2019, the IJ denied Kolov's application for withholding of removal and CAT protection. The IJ found that Kolov credibly established his Roma ethnicity but was not credible regarding the alleged incidents of persecution. Specifically, the IJ found that "material information concerning [his] claim was missing from the reasonable fear interview, his statement, and the 589 that related to the May of 2012 incident and then the severity of the November 2013 incident was not discussed and explicated." CA6 R. 7-2, Decision of IJ, Admin. R. 40. Further, the IJ dismissed Kolov's explanation for the omissions, that he was nervous and under stress, as "not credible." *Id.* For his CAT claim, the IJ concluded that Kolov failed to show government acquiescence to torture.

Kolov appealed to the BIA, contesting the IJ's credibility finding. He argued that he testified consistently about the May 2012 and November 2013 incidents and that he had submitted corroborating evidence to support his testimony. He also noted that he prepared his declaration in English without assistance.

The BIA dismissed the appeal, finding no clear error in the IJ's adverse credibility determination. In sum, the BIA found that Kolov's omissions were substantially related to his claim and rendered him not credible. Like the IJ, the BIA believed that Kolov's omission of the May 2012 attack in his interview, Form I-589, and declaration in addition to the omission of the November 2013 attack in his interview undermined his credibility. The BIA also agreed with the IJ that Kolov's explanation for the omissions was not persuasive. Accordingly, the BIA upheld the IJ's denial of Kolov's claims based on his failure to present a credible claim for relief.

Kolov now petitions for review of the BIA's decision. Kolov argues that the IJ and BIA erred as a matter of law in their adverse credibility finding because his omissions did not directly contradict his later testimony.

II.

We first address our jurisdiction, and we begin with some background. The Immigration and Nationality Act ("INA") created an expedited process for noncitizens who reenter the United States without authorization after having already been removed under 8 U.S.C. § 1229a. Such an individual does not receive new removal proceedings; instead, the prior removal order is simply reinstated. 8 U.S.C. § 1231(a)(5). To reinstate a prior order, the government obtains the prior order of removal, confirms the person's identity, determines whether the reentry was unauthorized, provides written notice to the noncitizen, permits him or her to contest its determination, and then reinstates the order. 8 C.F.R. §§ 241.8(a)–(c), 1241.8(a)–(c).

In addition to mandating an expedited removal process, the INA limits an individual's ability to challenge the reinstated removal order. The reinstated removal order is not subject to review, and the individual may not obtain "discretionary relief from the terms of the reinstated order." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 35 (2006); 8 U.S.C. § 1231(a)(5). The only relief that the individual may seek at that point is the prevention of his or her removal to the country specified in the removal order. *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2283 (2021). That is, the person may prevent removal to a country where he or she may face persecution based on membership in a protected group—referred to as statutory withholding of removal—or where he or she would be in danger of being subjected to torture—referred to as CAT protection. *Id.* at 2282. Thus, if an individual subject to a reinstated removal order expresses fear of returning to the country designated in the order, he or she is referred for a reasonable fear interview. 8 C.F.R. § 241.8(e). If the interviewing officer finds that the noncitizen has a reasonable fear of persecution, the individual receives consideration of only the withholding of removal claims before an IJ, whose order is reviewable by the BIA. *See id.*; *Johnson*, 141 S. Ct. at 2283.

We turn back to Kolov's case. Our jurisdiction over Kolov's petition depends on the interplay between two aspects of our power to review orders of removal. First, we may review only a "final order of removal." 8 U.S.C. § 1252(a)(1). Second, a petition seeking review of a final order must be filed within thirty days of the issuance of the final order. *Id.* § 1252(b)(1). This limitation is "mandatory and jurisdictional." *Stone v. I.N.S.*, 514 U.S. 386, 405 (1995) (citation omitted); *see Prekaj v. I.N.S.*, 384 F.3d 265, 267–68 (6th Cir. 2004). Thus, in our assessment of our jurisdiction to review Kolov's petition, we first consider what constitutes a "final order of removal" within the expedited process used to reinstate his removal order. Then, we look at whether Kolov sought review within thirty days of any final order's issuance.

The government initially contended that Kolov's petition is untimely, depriving us of jurisdiction. The government's position was that Kolov did not timely petition for review of his reinstated removal order (from November 2014) and that the BIA's later denial of withholding of removal (from August 2022) is not itself a "final order of removal" that carries its own thirty-day period to petition for review.[4] The Second and Fifth Circuits recently adopted this view in *Bhaktibhai-Patel v. Garland*, 32 F.4th 180 (2d Cir. 2022), and *Argueta-Hernandez v. Garland*, 73 F.4th 300 (5th Cir. 2023) (per curiam), respectively, both grounding their analysis in the Supreme Court's decisions in *Nasrallah v. Barr*, 140 S. Ct. 1683 (2020), and *Johnson v. Guzman Chavez*, 141 S. Ct. at 2271.

In *Nasrallah*, a noncitizen committed a crime that subjected him to removal; during the removal proceedings, he asserted claims under the CAT. 140 S. Ct. at 1688. The BIA concluded that the noncitizen did not establish that he would likely be tortured if removed and ordered his removal. *Id.* On appeal, the Eleventh Circuit declined to review the noncitizen's factual challenges to the BIA's CAT order, explaining that "judicial review of factual challenges to a final order of removal" was unavailable to noncitizens convicted of specified crimes. *Id.* at 1689 (internal quotation marks omitted). The Eleventh Circuit concluded that the prohibition

---

[4]The government subsequently withdrew this argument in light of *Santos-Zacaria v. Garland*, 143 S. Ct. 1103 (2023). In a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), the government suggests that under *Santos-Zacaria,* the thirty-day filing limit should be treated as a mandatory (and, therefore, waivable) claims processing rule, rather than a jurisdictional rule. And the government asks that we proceed to resolve the case on the merits. We have no briefing on the effect of *Santos-Zacaria* and decline to address that question here. Because our precedents dictate that we have jurisdiction, we consider Kolov's case on the merits.

extended to factual challenges to CAT orders raised in the same proceedings. *Id.* The Supreme Court reversed, holding that the statutory prohibition on factual challenges to final orders of removal did not extend to CAT orders. *Id.* at 1691. Because CAT orders bar removal only to a specific country but do not affect the validity of the removal order, the Court reasoned, they did not merge into the "final order of removal" or become subject to the limits on judicial review of those orders. *Id.*

Then, in *Johnson*, noncitizens were detained without bond hearings during the time between the reinstatement of their removal orders and the hearings on their withholding of removal claims. 141 S. Ct. at 2283. The Supreme Court considered which statute applied—the one requiring bond hearings for noncitizens detained "pending a decision on whether the alien is to be removed," or the one carrying no such requirement for those already "ordered removed." *Id.* at 2280. The latter statute applied in this context if a reinstated order of removal was "administratively final" during the period that a noncitizen sought withholding-only relief. *Id.* at 2284; *see* 8 U.S.C. § 1231(a)(1)(B)(i), (2). The noncitizens argued that the reinstated orders were not "administratively final" because they could still seek that relief. The Court disagreed. It held that the noncitizens were not entitled to an individualized bond hearing because they had already been "ordered removed" by their reinstated orders of removal. *Id.* at 2284–85. The noncitizens' pursuit of withholding-only relief did not affect the administrative finality of the removal order because this relief would only bar the noncitizen from being removed to a specific country but did not bar the noncitizen's removal generally. *Id.* at 2285–86. So the reinstated removal orders remained "administratively final" within the meaning of § 1231 even during the time that they sought withholding-only relief before an immigration judge and the BIA. *Id.* at 2284–85.

The Second Circuit recently concluded that *Nasrallah* and *Johnson* precluded review of the BIA's denial of withholding-only relief following a reinstated removal order. It reasoned that *Nasrallah* and *Johnson* clarified that orders denying withholding of removal and CAT protection are not "final orders of removal" that are judicially reviewable under § 1252(a) and that the noncitizen's failure to seek review of the reinstated removal order within thirty days (but before the withholding-only proceedings concluded) rendered any challenge to that earlier order

untimely under § 1252(b)(1).**5** *Bhaktibhai-Patel*, 32 F.4th at 189–93. The Fifth Circuit subsequently concluded the same. *Argueta-Hernandez*, 73 F.4th at 303–04 (relying on *Nasrallah* and *Johnson* to hold that the BIA's denial of the petitioner's "application for withholding of removal and CAT relief is not a final order of removal. And his petition is untimely because it was filed over 30 days after his reinstatement order became final."). The Fourth Circuit appears to take the opposite view, recently holding that the IJ's reasonable fear determination is the "final order" for purposes of judicial review. *Tomas-Ramos v. Garland*, 24 F.4th 973, 980 n.3 (4th Cir. 2022); *see also Salinas-Montenegro v. Garland*, No. 21-3, 2023 WL 3243985, at *1 n.1 (9th Cir. May 4, 2023) (memorandum opinion) (holding that the court was bound by precedent and had jurisdiction because the petitioner "timely filed his petition for review within thirty days of the completion of his withholding-only proceedings").

Unlike our sister circuits,**6** we remain bound by circuit precedent permitting review of BIA orders on withholding-only and CAT relief in these circumstances. Before *Johnson*, we had reached the same result as the Supreme Court by holding that noncitizens subject to reinstated removal orders are not entitled to bond hearings. *See Martinez v. Larose*, 968 F.3d 555, 560–64 (6th Cir. 2020). In the process, we rejected the argument that the phrase "administratively final" (the phrase in § 1231(a)(1)(B)(i) that *Johnson* considered for the bond-hearing issue) meant the same thing as the phrase "final order of removal" (the phrase in § 1252(a)(1) that concerns judicial review). *See id.* at 562–63. Agreeing with the Ninth Circuit, we reasoned that the reinstated removal order could be "administratively final" for purposes of detention even if it "lacks finality for purposes of judicial review of [a noncitizen's] withholding-only claim." *Id.* (quoting *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017)). Put another way, we reasoned that the denial of withholding-only relief would qualify as the final order of removal

---

**5**The government's 28(j) letter tells us that they will be arguing to the Second Circuit that *Bhaktibhai-Patel* should be reconsidered.

**6**In *Bhaktibhai-Patel*, the Second Circuit concluded that its decision in *Guerra v. Shanahan*, 831 F.3d 59 (2d Cir. 2016), had been abrogated by *Johnson*. *See* 32 F.4th at 193. *Guerra*, however, held that the reinstated removal order was not "administratively final" until the conclusion of the withholding-only proceedings, and *Johnson* expressly rejected this reasoning. *See id.* Similarly, in *Argueta-Hernandez*, the Fifth Circuit held that it was bound by *Nasrallah* and *Johnson* to disregard its precedent in *Ponce-Osorio v. Johnson*, 824 F.3d 502 (5th Cir. 2016). *See* 73 F.4th at 303. There, the Fifth Circuit found that "*Ponce-Osorio*'s sweeping definition of finality is also 'unequivocally inconsistent' with *Nasrallah* and *Johnson*." *Id.* Neither *Johnson* nor *Nasrallah* expressly rejected the reasoning in our binding precedent.

subject to judicial review. Notably, moreover, the Supreme Court expressly refused to consider this judicial-review issue in *Johnson*, so that decision does not undermine our logic in *Martinez*. 141 S. Ct. at 2285 n.6.

*Martinez*'s logic also comports with our earlier precedent. Outside the present context involving reinstated orders of removal and withholding-only proceedings under § 1231, we have long treated general denials of "withholding of removal" as orders of removal (or orders of deportation under an earlier version of the statute) "that may be judicially reviewed." *Giraldo v. Holder*, 654 F.3d 609, 613–14 (6th Cir. 2011) (quoting *Perkovic v. I.N.S.*, 33 F.3d 615, 618–19 (6th Cir. 1994)). As we explained in *Perkovic*, an order about withholding of removal functions as a reviewable final order because such relief could foreclose an avenue of deportation if granted. 33 F.3d at 618–19. These holdings are not clearly inconsistent with *Nasrallah* and *Johnson* and therefore remain binding. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) ("A published prior panel decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.") (citation and internal quotation marks omitted). We therefore have jurisdiction under *Martinez*, *Giraldo*, and *Perkovic*.

III.

For a successful withholding of removal claim, an applicant must establish by a "clear probability" that his or her life or freedom would be threatened in the designated country on account of a statutorily protected ground. *Berri v. Gonzalez*, 468 F.3d 390, 397 (6th Cir. 2006) (citation omitted); 8 U.S.C. § 1231(b)(3). The applicant must also establish that the protected ground was a reason for the persecution. *Guzman-Vasquez v. Barr*, 959 F.3d 253, 274 (6th Cir. 2020). To receive protection under the CAT, an applicant must show that "it is more likely than not that [he or she] would be tortured if removed to the proposed country of removal." *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.16(c)(2)). Further, the torture must occur "with the consent or acquiescence of a public official." 8 C.F.R. § 1208.18(a)(1). Such acquiescence can include public officials' "willful blindness" to torture committed by private individuals. *Amir v. Gonzalez*, 467 F.3d 921, 927 (6th Cir. 2006) (citation omitted).

We apply the same standard of review to withholding of removal claims and requests for protection under the CAT. *Kamar v. Sessions*, 875 F.3d 811, 817 (6th Cir. 2017). When the BIA issues a written opinion, we review the decision of the BIA "as the final agency determination." *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quoting *Hachem v. Holder*, 656 F.3d 430, 437 (6th Cir. 2011)). To the extent that the BIA adopts the IJ's reasoning, we also review the IJ's decision. *Id.*

Since the REAL ID Act, an IJ assessing the credibility of a petitioner seeking withholding of removal and CAT protection considers the totality of the circumstances. *See* 8 U.S.C. § 1158(b)(1)(B)(iii); *Slyusar v. Holder*, 740 F.3d 1068, 1075 (6th Cir. 2014). Among other things, an IJ may consider "the inherent plausibility" of an applicant's account, "the consistency between the applicant's . . . written and oral statements," and "any inaccuracies" in an applicant's statements. 8 U.S.C. § 1158(b)(1)(B)(iii). An adverse credibility finding will often defeat an applicant's claim for withholding of removal and protection under the CAT. *Slyusar*, 740 F.3d at 1072 (withholding of removal); *Luna-Romero v. Barr*, 949 F.3d 292, 295 (6th Cir. 2020) (CAT).

Credibility determinations are findings of fact. *Marikasi v. Lynch*, 840 F.3d 281, 287 (6th Cir. 2016) (quoting *Sylla v. I.N.S.*, 388 F.3d 924, 925 (6th Cir. 2004)). We review factual findings under the deferential substantial evidence standard, considering whether they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citation omitted). Under this standard, we may not reverse simply because we would have come to a different conclusion. *Sylla*, 388 F.3d at 925. Instead, we will not disturb the agency's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Nasrallah*, 140 S. Ct. at 1692 (quoting 8 U.S.C. § 1252(b)(4)(B)). That is, "reversal is available only if the petitioner presents evidence sufficient that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Bah v. Gonzalez*, 462 F.3d 637, 640 (6th Cir. 2006) (citations omitted).

The IJ found Kolov not credible, pointing to his omission of the May 2012 and November 2013 incidents in his interview and Form I-589. The BIA upheld the IJ's findings, agreeing that Kolov's later addition of the two incidents discredited his claims.

Kolov has not presented evidence that would compel a reasonable adjudicator to disagree with the IJ's finding. The thrust of his argument is that the omissions did not directly contradict his later testimony and thus cannot be the basis of an adverse credibility finding. Specifically, Kolov asserts that the BIA misapplied our decision in *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). According to Kolov, under *Liti*, only an omission that directly contradicts later testimony can support an adverse credibility determination.

We disagree with Kolov's reading of *Liti*. In *Liti*,[7] we reviewed an adverse credibility determination that was based on "conflicts between the testimony of the [applicant] and the written asylum application . . . [with] no reasonable explanation for those discrepancies." *Id.* at 637 (citation omitted). Specifically, the IJ found that the applicants, the Litis, failed to include two significant incidents—participation in a major anti-government protest and a leadership role in crashing through the gates of the Germany Embassy to seek asylum—in their written application but later testified about those events. *Id.* at 637–38. The BIA upheld this determination, but we reversed. *Id.* at 639.

In doing so, we acknowledged that the Litis' application "did not provide specific details of the two events" but noted that "the application [did] not contain *any* specific incidents, but rather consist[ed] of generalized statements of the Litis' anti-communist activities." *Id.* at 638. That is, the Litis wrote in their application that they had taken part in numerous anti-government activities over the course of six years, intimating that they could not recount each occurrence of government retaliation in response to their long history of political protest. *Id.* We concluded that the Litis' later elaboration on their "generalized statements" did not contradict their written

---

[7]A different standard applied in pre-REAL ID Act *Liti*. Specifically, the adverse credibility finding had to have been based on "issues that [went] to the heart of the applicant's claim." *Liti*, 411 F.3d at 637. We now consider the totality of the circumstances, including "the inherent plausibility" of an applicant's account, "the consistency between the applicant's . . . written and oral statements," and "any inaccuracies" in an applicant's statements. 8 U.S.C. § 1158(b)(1)(B)(iii); *see Marikasi*, 840 F.3d at 287 n.1 (noting the difference between *Liti* and the REAL ID Act standards).

application; it instead reinforced "their claim of a long history of political protest which [could not] be limited to a few specific instances." *Id.* Because the Litis' later inclusion of specific incidents did not contradict their earlier generalized statements, we concluded that the BIA's adverse credibility finding was unsupported by the record. *Id.* at 639.

Despite our reversal of the Litis' adverse credibility finding, we did not set forth a bright-line rule that only directly contradictory omissions warrant an adverse credibility finding. Instead, we held that the Litis' particular omissions did not suffice within the context of their application. *Id.* at 638–39.

Kolov's omissions, however, differ in important respects. Kolov claimed that he suffered ethnic persecution in Bulgaria, which he supported by cataloging specific incidents. Kolov described several incidents of harassment or violence in his interview, but he failed to mention the November 2013 restaurant incident or the May 2012 coffee shop incident. Kolov also failed to include either incident in his Form I-589, despite describing several other incidents within his application. He did include the November 2013 incident in his attached declaration, but he still did not mention the events from May 2012.

When questioned about these omissions, Kolov claimed that the flow of the interview did not give him an opportunity to disclose the incidents. But before the asylum officer wrapped up the interview, she asked Kolov whether he had any additional information that they had not discussed, and he responded that he did not. And when the officer asked whether the summary of Kolov's claims was accurate, he indicated that it was. These prompts discredit Kolov's contention that he had no opportunity to mention the November 2013 or May 2012 incident during the interview.

Considering the totality of the circumstances, the record supports the BIA's adverse credibility finding. Unlike in *Liti*, Kolov's testimony did not simply add form and detail to generalized statements in his written application. Instead, from the outset, Kolov's claim was built on identifying specific incidents of harassment and asserting that they amounted to persecution. And despite opportunity to disclose each incident of harassment from the beginning, Kolov added new instances of ethnic harassment as his claim proceeded. Thus, the

BIA could reasonably interpret Kolov's evolving claims as not credible, devised only to strengthen his claim as it proceeded. *See, e.g., Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (discrepancies deemed an attempt to enhance the claimed persecution may bear on credibility). Assuredly, a reasonable adjudicator would not be compelled to find the opposite.

IV.

We deny the petition for review.

———————————

**CONCURRENCE**

———————————

MURPHY, Circuit Judge, concurring. This case shows that there might be a "butterfly effect" in law, not just nature. Congress permits immigrants in removal proceedings to obtain judicial review of just one thing: a "final order of removal." 8 U.S.C. § 1252(a)(1). And Congress requires immigrants to petition for that review within 30 days—a time limit that courts have treated as jurisdictional. *See Stone v. INS*, 514 U.S. 386, 405 (1995). As with any jurisdictional issue, then, immigrants need clear guidance on what qualifies as the "final order of removal" from which they must seek review in 30 days. *See Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 14 (2015).

Courts traditionally read the phrase "final order of removal" (or its predecessor, "final order of deportation") broadly to cover the rejection of many types of claims in removal proceedings. Yet two recent decisions on unrelated issues—*Nasrallah v. Barr*, 140 S. Ct. 1683 (2020), and *Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021)—may have (intentionally or not) uprooted this traditional view. These decisions implicate two questions critical to any petition for review: What orders qualify as the "orders of removal" from which immigrants may seek review? And when do those orders become "final"? Given the emerging conflict on the effect of these decisions, the Supreme Court may eventually have to intervene. *Compare Argueta-Hernandez v. Garland*, 73 F.4th 300, 302–03 (5th Cir. 2023) (per curiam); *and Bhaktibhai-Patel v. Garland*, 32 F.4th 180, 190–95 (2d Cir. 2022), *with Arostegui-Maldonado v. Garland*, __ F.4th __, 2023 WL 4880441, at *5–6 (10th Cir. Aug. 1, 2023), *and Salinas-Montenegro v. Garland*, 2023 WL 3243985, at *1 n.1 (9th Cir. May 4, 2023) (mem.). In the meantime, I agree that we should stick with our current approach. I write to flag some contexts in which *Nasrallah* and *Johnson* might matter.

1. Traditional Interpretation of Judicial-Review Provision

In 1961, Congress amended the Immigration and Nationality Act to give circuit courts the "exclusive" power to review "all final orders of deportation[.]" Act of Sept. 26, 1961, Pub. L.

No. 87-301, § 5(a), 75 Stat. 651 (codified at 8 U.S.C. § 1105a(a) (1964)).  At that time, Congress left the phrase "final order of deportation" undefined.

The Supreme Court and our court interpreted the phrase broadly.  *See Foti v. INS*, 375 U.S. 217, 222 (1963); *Perkovic v. INS*, 33 F.3d 615, 618 (6th Cir. 1994).  The Supreme Court held that "final order of deportation" included (and gave circuit courts the power to review) more than just the "adjudication of deportability" (that is, the finding that an immigrant was deportable).  *Foti*, 375 U.S. at 222.  The Court read the phrase to include other decisions made during a deportation proceeding, including the denial of suspension of deportation.  *Id.*  We likewise held that the phrase reached decisions to deny "applications for withholding of deportation or for asylum[.]"  *Perkovic*, 33 F.3d at 618; *see also Gumbol v. INS*, 815 F.2d 406, 408 (6th Cir. 1987).  Like the well-known final-judgment rule, this reading eliminated the inefficient "[b]ifurcation" of appeals by allowing immigrants to seek review of all issues at once after the Board of Immigration Appeals resolved them.  *Foti*, 375 U.S. at 232; *cf. Microsoft Corp. v. Baker*, 582 U.S. 23, 36–37 (2017).  In addition, the Supreme Court also read the phrase to reach some *later* Board decisions that came after a "final order of deportation," including a denial of a motion to reopen the deportation proceeding.  *See Cheng Fan Kwok v. INS*, 392 U.S. 206, 211 (1968) (discussing *Giova v. Rosenberg*, 379 U.S. 18 (1968) (per curiam)); *see also INS v. Chadha*, 462 U.S. 919, 928, 937–39 (1983).

If this precedent governed here, nobody would question our jurisdiction over Nikolay Kolov's petition for review.  After the government removed Kolov to Bulgaria, he returned to this country.  An immigration officer found him removable and reinstated his prior order of removal.  8 U.S.C. § 1231(a)(5).  Claiming that he would be harmed back in Bulgaria, Kolov then sought withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and the Convention Against Torture (CAT).  An immigration judge denied that relief, and the Board rejected his appeal.  This denial likely would have counted as a "final order of deportation" under *Foti*.  The Court would have treated the reinstatement of the removal order—like the denial of a motion to reopen that order—as part of the deportation "proceeding."  *Cheng Fan Kwok*, 392 U.S. at 211.  And the decision whether to grant Kolov "withholding" would have counted as an order of deportation because, if granted, it "would foreclose" his removal to Bulgaria.  *Perkovic*, 33 F.3d at 618.

2. Congress's 1996 Changes

In 1996, however, Congress passed two laws that revamped this review framework. In the Antiterrorism and Effective Death Penalty Act (AEDPA), Congress stripped courts of jurisdiction to review a "final order of deportation" of an immigrant who had committed certain crimes. *See* Pub. L. No. 104-132, § 440(a), 110 Stat. 1214, 1276–77 (codified as amended at 8 U.S.C. § 1252(a)(2)(C)). More relevant here, AEDPA added a definition for the phrase "final order of deportation." It defined "order of deportation" to mean "the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation." *Id.* § 440(b), 110 Stat. at 1277 (codified at 8 U.S.C. § 1101(a)(47)(A)). It then stated that this "order" became "final upon the earlier of" "a determination by the Board of Immigration Appeals affirming such order" or "the expiration of the period in which the alien is permitted to seek review of such order by the Board[.]" *Id.* (codified at 8 U.S.C. § 1101(a)(47)(B)).

Next, in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress rearranged the provisions governing our review of orders of deportation. *See* Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-607 to -612. IRRIRA moved those provisions to their current home: 8 U.S.C. § 1252. It also changed the language in the provisions (and elsewhere) from "final order of *deportation*" to "final order of *removal*." *Id.* § 1252(a) (emphasis added). For some reason, Congress still kept the phrase "order of deportation" rather than "order of removal" in the "definitions" section. 8 U.S.C. § 1101(a)(47). But courts have read those phrases to mean the same thing, *see, e.g.*, *Nasrallah*, 140 S. Ct. at 1692; *Bhaktibhai-Patel*, 32 F.4th at 189 n.11, and I will refer to them interchangeably as well. Lastly, IRRIRA restricted judicial review of final orders of removal in other ways. It, for example, prohibited our review of certain discretionary decisions, 8 U.S.C. § 1252(a)(2)(B), and banned our review through avenues other than "a final order under this section," *id.* § 1252(b)(9).

3. Judicial Interpretation of 1996 Changes

In the years after these 1996 changes, courts seemingly continued to follow *Foti*'s broad reading of "final order of removal." They did so without giving much thought to AEDPA's new definitions of "final" and "order of deportation." At least three examples prove my point.

*Example One: Motions to Reopen*. Under the *Foti* regime, the Supreme Court held that the denial of a motion to reopen a final order of deportation counted as a distinct "final order of deportation" reviewable by the courts. *Cheng Fan Kwok*, 392 U.S. at 211. In two cases after the 1996 changes, the Court continued to treat these denials as reviewable "final orders of removal" without asking whether they fit within AEDPA's definition. *See Mata v. Lynch*, 576 U.S. 143, 147–48 (2015) (citing *Kucana v. Holder*, 558 U.S. 233, 242, 253 (2010)). In one case, the Court held that courts had jurisdiction to review the Board's denial of an untimely motion to reopen. *See id.* at 147–51. In the other, it held that IIRIRA's ban on the review of the Board's discretionary decisions did not cover denials of motions to reopen. *Kucana*, 558 U.S. at 242–52.

*Example Two: "Mixed" Board Decisions*. In ordinary removal proceedings, the Board often affirms a conclusion that an immigrant is removable but remands for more proceedings on the immigrant's claims for withholding of removal under § 1231(b)(3)(A) or CAT. *See, e.g.*, *Chupina v. Holder*, 570 F.3d 99, 103–04 (2d Cir. 2009) (per curiam); *Kouambo v. Barr*, 943 F.3d 205, 208–09 (4th Cir. 2019); *Abdisalan v. Holder*, 774 F.3d 517, 520–21 (9th Cir. 2014) (en banc); *Mahecha-Granados v. Holder*, 324 F. App'x 735, 737–39 (10th Cir. 2009). Such a mixed decision might have been considered a "final order of removal" under AEDPA's definition because it "affirm[ed]" the "order" that the immigrant was "deportable" and required more proceedings only on the withholding issue. 8 U.S.C. § 1101(a)(47). Most courts rejected this reading. They held that an order of removal did not become "final" until the Board resolved all claims that could affect the order. *See Kouambo*, 943 F.3d at 211–14. And they believed that withholding claims could affect the order because those claims would bar an immigrant's removal to the country listed. *See Chupina*, 570 F.3d at 103–04. Conversely, courts held that an order of removal became "final" if the Board remanded on matters that could not affect the order—such as a motion to voluntarily depart the country. *See Giraldo v. Holder*, 654 F.3d 609, 612–15 (6th Cir. 2011) (citing cases).

*Example Three: Withholding-Only Orders*.  IIRIRA amended the expedited removal process for immigrants like Kolov who return to the United States after the government has removed them.  *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–35 (2006).  This amendment instructed the Attorney General to "reinstate[]" "the prior order of removal" and added that the immigrant was "not eligible and may not apply for any relief under this chapter[.]" 8 U.S.C. § 1231(a)(5).  Despite this categorical ban on relief, the Attorney General interpreted the law to allow these immigrants to seek withholding under § 1231(b)(3)(A) or CAT.  8 C.F.R. § 1241.8(e).

When an immigrant seeks withholding-only relief, what (if anything) counts as the "order of removal" and when does it become "final"?  Most courts treated an order reinstating the removal order as a distinct "order of removal" even after AEDPA.  *See Moreno-Martinez v. Barr*, 932 F.3d 461, 463–65 (6th Cir. 2019); *Villegas de la Paz v. Holder*, 640 F.3d 650, 654, 656 (6th Cir. 2010); *see also Arevalo v. Ashcroft*, 344 F.3d 1, 9 (1st Cir. 2003); *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 150 (2d Cir. 2008); *Dinnall v. Gonzales*, 421 F.3d 247, 251 n.6 (3d Cir. 2005); *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 294–45 (5th Cir. 2002); *Gomez-Chavez v. Perryman*, 308 F.3d 796, 801 (7th Cir. 2002); *Briones-Sanchez v. Heinauer*, 319 F.3d 324, 326 (8th Cir. 2003); *Castro-Cortez v. INS*, 239 F.3d 1037, 1043–44 (9th Cir. 2001), *abrogated by Fernandez-Vargas*, 548 U.S. at 36 n.5; *Duran-Hernandez v. Ashcroft*, 348 F.3d 1158, 1162 n.3 (10th Cir. 2003); *Avila v. U.S. Att'y Gen.*, 560 F.3d 1281, 1284 (11th Cir. 2009).

And most courts held that this unique order of removal became "final" (and so judicially reviewable) only after an immigrant litigated to the Board any claims for withholding of removal.  *See Ponce-Osorio v. Johnson*, 824 F.3d 502, 505–06 (5th Cir. 2016) (per curiam); *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 957–58 (9th Cir. 2012); *Luna-Garcia v. Holder*, 777 F.3d 1182, 1185 (10th Cir. 2015); *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1308 (11th Cir. 2016).

### 4. Effects of *Nasrallah* and *Johnson*

The Supreme Court's decisions in *Nasrallah* and *Johnson* implicate all three examples. In *Nasrallah*, the Board both affirmed an immigration judge's order finding an immigrant

removable and reversed the judge's order granting the immigrant protection under CAT. 140 S. Ct. at 1688. The immigrant sought judicial review of the factual findings that led the Board to deny his CAT claim. *Id.* at 1688–89. Yet because the immigrant had been criminally convicted, AEDPA's jurisdictional limit barred the court from reviewing the factual findings underlying the "final order of removal." *See* 8 U.S.C. § 1252(a)(2)(C)–(D). The immigrant argued that the denial of his CAT claim was not part of the "final order of removal" and so not subject to this limit on review of factual findings. *Nasrallah*, 140 S. Ct. at 1689.

The Court agreed. *Id.* at 1690–94. It held that a decision granting or denying CAT protection does not *itself* qualify as an "order of deportation" under AEDPA's definition because it does not "conclud[e]" that an immigrant is "deportable or order[] deportation" of the immigrant. *Id.* at 1692 (quoting 8 U.S.C. § 1101(a)(47)(A)). Why? The Court reasoned that even a *grant* of CAT relief would not "disturb" the Board's removability finding. *Id.* at 1691. That is because such a grant would prohibit the immigrant's removal only to a *specific* country and would not undermine the *general* conclusion that the immigrant is removable or bar removal to other places. *Id.* This view, though, came with a problem: How did a court even have jurisdiction to review a CAT denial since the judicial-review provision gave it jurisdiction only of a "final order of removal"? 8 U.S.C. § 1252(a)(1). The Court held that another statute made the denial of CAT protection reviewable "as part of the review of [the] final order of removal" that this denial accompanied. *Nasrallah*, 140 S. Ct. at 1691 (quoting Foreign Affairs Reform and Restructuring Act of 1998, § 2242(d), 112 Stat. 2681–822, note following 8 U.S.C. § 1231).

In *Johnson*, the Court next considered a question about the detention of immigrants like Kolov who have had their prior orders of removal reinstated and who seek withholding-only relief under § 1231(b)(3)(A) or CAT. 141 S. Ct. at 2280. The immigration laws require the government to "detain" all immigrants subject to orders of removal during a 90-day window (defined as the "removal period") in which it must remove them. 8 U.S.C. § 1231(a)(1)(C), (a)(2). This "removal period" begins on, among other dates, "[t]he date the order of removal becomes administratively final." *Id.* § 1231(a)(1)(B)(i). *Johnson* held that an immigrant's reinstated order of removal becomes "administratively final" when the order gets reinstated— even if the immigrant continues to seek withholding-only relief under § 1231(b)(3)(A) or CAT.

141 S. Ct. at 2284–85. Like *Nasrallah*, the Court reasoned that a reinstated removal order is final when issued because a grant of withholding would not change the immigrant's removability from the United States. *See id.* at 2285–88. It would only bar the immigrant's removal to a specific country. *See id.*

*Nasrallah* and *Johnson* did not consider the scope of our jurisdiction. But the decisions could affect all three examples that I have identified (and perhaps others).

*Example One: Motions to Reopen*. The Supreme Court's traditional view that the denial of a motion to reopen removal proceedings qualifies as a reviewable "final order of removal" has rested more on *Foti*'s broad reading than on AEDPA's definition. The Court in *Kucana* even relied on pre-1996 cases as the support for its suggestion that courts retained jurisdiction over denials of motion to reopen after 1996. *See* 558 U.S. at 242. To be sure, one might have read AEDPA's generic definition of "order of deportation"—an "order" "concluding that the alien is deportable or ordering deportation," 8 U.S.C. § 1101(a)(47)(A)—as merely codifying the pre-1996 regime. But *Nasrallah* rejected this view. It suggested that AEDPA's text defined "final 'order of deportation' more narrowly than [the] Court interpreted the term in *Foti*." 140 S. Ct. at 1692.

*Nasrallah*'s logic thus calls into question our jurisdiction over denials of motions to reopen. Indeed, neither *Mata* nor *Kucana* even mentioned AEDPA's definition of "order of removal," let alone considered whether the denial of a motion to reopen fell within the definition. The key question now will be whether such a denial qualifies as an "order" "concluding that the alien is deportable or ordering deportation" under *Nasrallah*'s narrower view of that phrase. 8 U.S.C. § 1101(a)(1)(A). The answer is not obvious to me. On the one hand, the earlier "final order of removal" will have found that the immigrant is removable and ordered the immigrant's removal; the denial of the motion to reopen will have simply refused to reopen proceedings. On the other hand, perhaps immigrants could assert that a specific denial "conclud[es]" that they are "removable" if their motion to reopen expressly made arguments that would have overturned the final order's prior "removability" finding. In other words, if "the validity of the final order [was] contingent" on the denial of the motion to reopen, that denial might still qualify as a "final order of removal" under *Nasrallah*. 140 S. Ct. at 1691 (quoting *Chadha*, 462 U.S. at 938).

Yet an immigrant's motion to reopen may often concede removability and challenge only an earlier denial of withholding under § 1231(b)(3)(A) or CAT. After all, the immigration laws set no time limit on motions to reopen seeking withholding based on "changed country conditions" in the country "to which removal has been ordered[.]" 8 U.S.C. § 1229a(c)(7)(C)(ii); *cf. Kucana*, 558 U.S. at 240 & n.5. But *Nasrallah* held that CAT denials are not "orders of removal" under AEDPA's definition because they do not "conclud[e] that the alien is deportable or order[] deportation." 140 S. Ct. at 1691. *Johnson* extended this reasoning to statutory withholding claims. 141 S. Ct. at 2287–88. At the least, then, these cases could affect our ability to review the (potentially large) subset of motions to reopen that seek withholding under § 1231(b)(3)(A) or CAT. So even though Congress did not strip courts of their prior jurisdiction to review denials of motion to reopen in IRRIRA's express provisions limiting judicial review, *see Kucana*, 558 U.S. at 249–50, *Nasrallah*'s logic might suggest that Congress did so through a bland definition of "order of deportation" in a law (AEDPA) that primarily concerned criminal immigrants.

*Example Two: "Mixed" Board Decisions*. *Nasrallah* and *Johnson* also could alter how courts treat "mixed" Board decisions (decisions in ordinary removal proceedings that affirm an immigration judge's removability finding but remand for further consideration of withholding claims under § 1231(b)(3)(A) or CAT). Courts typically held that these decisions were not "final" (and so not immediately reviewable) because the pending request for withholding could "affect" the order finding an immigrant removable to a country. *See, e.g.*, *Chupina*, 570 F.3d at 103.

Yet *Nasrallah* and *Johnson* seemingly reject this reasoning. *Nasrallah* held that "the Board's ruling on a CAT claim does not affect the validity of the final order of removal" because the requested relief would only bar the immigrant's removal to a specific country. 140 S. Ct. at 1691. And *Johnson* likewise held that "the finality of [an] order of removal does not depend in any way on the outcome" of a withholding claim under § 1231(b)(3)(A). 141 S. Ct. at 2287.

This logic has repercussions for both parts of a "mixed" Board decision: the part affirming removability and the part remanding withholding claims. Start with the part affirming removability. If it now qualifies as the "final" order under 8 U.S.C. § 1101(a)(47)(B),

immigrants must petition a court for review of the order within 30 days while they continue to litigate their withholding claims in removal proceedings. *Id.* § 1252(b)(1). And since courts treat the 30-day limit as jurisdictional, *see Stone*, 514 U.S. at 405, the failure to file this petition could bar judicial review of these otherwise interlocutory orders at the end of those removal proceedings.

Turn to the part remanding the withholding claims. Suppose the immigration judge later issues a second order denying withholding under § 1231(b)(3)(A) and CAT and the Board affirms this denial. Would this second order be a distinct "final order of removal" under AEDPA's definition? *Nasrallah* suggests that CAT denials fall outside that definition. 140 S. Ct. at 1691. It found that courts could review these denials only because another statute made them "reviewable '*as part of* the review of a final order of removal' under 8 U.S.C. § 1252." *Id.* (emphasis added) (citation omitted). It thus treated as critical the fact that the CAT denial arose as "part" of the final order of removal. In "mixed" decisions, though, CAT denials come later— separate from the "order of removal." Should this happenstance of the administrative process eliminate our ability to review these denials? *Cf. Kouambo*, 943 F.3d at 213–14. What sense would it make to allow courts to review withholding claims if they arise from a single Board decision in the removal proceeding but not if they arise from a later Board decision in that proceeding?

*Example Three: Withholding-Only Orders*. *Nasrallah* and *Johnson* lastly could alter how courts treat withholding-only proceedings. Courts typically held that an order reinstating a prior order of removal was not "final" if immigrants had pending applications for withholding under § 1231(b)(3)(A) or CAT. *See Luna-Garcia*, 777 F.3d at 1185. Like the courts reviewing "mixed" Board decisions, these courts reasoned that the pending withholding claims could affect "the rights, obligations, and legal consequences of the reinstated removal order[.]" *Id.* As the Second Circuit recognized, however, this logic sits uncomfortably next to *Johnson*, which found the reinstated removal order "administratively final" for detention purposes even if withholding claims remained pending. *Bhaktibhai-Patel*, 32 F.4th at 193–95; *see also Johnson*, 141 S. Ct. at 2287.

That leaves two possibilities for why denials of withholding in withholding-only proceedings nevertheless remain reviewable. I find both debatable after *Nasrallah* and *Johnson*.

Possibility One: An immigrant might argue that the reinstated order of removal is not "final" for judicial-review purposes even if it is "administratively final" for *Johnson*'s detention purposes. Following the Ninth Circuit, we adopted this reasoning in *Martinez v. Larose*, 968 F.3d 555, 562–63 (6th Cir. 2020). And perhaps we should interpret the word "final" in the judicial-review provision against the background of the final-judgment rule—which presumes that there will be one appeal at the end of proceedings rather than many appeals in "fits and starts" after each order. *Kouambo*, 943 F.3d at 211; *see also Microsoft*, 582 U.S. at 36–37. By comparison, this final-judgment background presumption would have no application for detention purposes. Moreover, even if the grant of withholding would not affect an immigrant's general removability, it would at least alter the terms of a removal order by barring removal to the specific country that the order lists—in Kolov's case, Bulgaria. A.R. 565. In that sense, the Board's decision affirming the denial of withholding can be seen as a "determination" "affirming" a reinstated removal order without change. 8 U.S.C. § 1101(a)(47)(B)(i). Yet, as the Second Circuit countered, *Johnson* causes problems for this theory because courts seldom read the same word to have different meanings in the same law. *See Bhaktibhai-Patel*, 32 F.4th at 194.

Possibility Two: Even if the reinstated order of removal is a "final order of removal" (subject to the 30-day petition-for-review window), the later order denying withholding in withholding-only proceedings could qualify as a separate "final order of removal." In that respect, courts have reasoned that even the *grant* of withholding fits AEDPA's definition of "order of removal" given that the grant must contain an "explicit order of removal" because the government can remove the immigrant to other countries. *Kouambo*, 943 F.3d at 210 (quoting *Matter of I-S & C-S-*, 24 I. & N. Dec. 432, 434 (B.I.A. 2008)); *see also Chupina*, 570 F.3d at 104. The grant thus could be seen as an "order" "ordering deportation." 8 U.S.C. § 1101(a)(47)(A). And the *denial* of withholding could likewise be seen as an order "ordering deportation" to the country that the immigrant sought to avoid by filing for withholding. *Id.* Yet, as the Second Circuit also countered, *Nasrallah* causes problems for this alternative theory

because it suggests that a CAT denial does not fall within AEDPA's definition. *See Bhaktibhai-Patel*, 32 F.4th at 190–91.

For what it is worth, the Supreme Court might agree with one of these theories because it recently reviewed the denial of withholding in withholding-only proceedings. *See Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1110–11 (2023). Then again, maybe not. *Santos-Zacaria* did not consider this jurisdictional issue. And the Court refuses to treat "drive-by" jurisdictional rulings as binding. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

\* \* \*

In the end, whether the Supreme Court's decisions in *Nasrallah* and *Johnson* have ushered in these significant changes to longstanding judicial-review practices is for the Supreme Court to decide. Until it does, I agree that we should continue to follow our current approach.