**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1208(L), No. 25-1076**

———————

MARIO RENE LOPEZ,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

———————

On Petitions for Review of Orders of the Board of Immigration Appeals.

———————

Argued: October 22, 2025                    Decided: February 13, 2026

———————

Before QUATTLEBAUM, HEYTENS, and BERNER, Circuit Judges.

———————

Petitions granted; vacated and remanded with instructions by published opinion. Judge Heytens wrote the opinion, which Judge Quattlebaum and Judge Berner joined.

———————

**ARGUED:** Benjamin James Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioner. Gregory A. Pennington, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** John W. Goodman, Hannah Bridges, Alexandra Ciullo, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioner. Yaakov M. Roth, Acting Assistant Attorney General, Nancy Friedman, Acting Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

TOBY HEYTENS, Circuit Judge:

Under a now-repealed federal statute, certain children "born out of wedlock" and lawfully present in the United States automatically became U.S. citizens if their mother naturalized and "the paternity of the child ha[d] *not* been established by legitimation." 8 U.S.C. § 1432(a)(3) (1952) (emphasis added). The question before us is whether petitioner Mario Lopez's "paternity" had been "established by legitimation" when his mother naturalized. We conclude it had not. And because all agree that Lopez meets the remaining requirements for derivative citizenship, he automatically became a U.S. citizen upon his mother's naturalization. We therefore grant the petitions for review, vacate the underlying orders, and remand with instructions to terminate Lopez's removal proceedings.

## I.

Lopez was born in El Salvador in 1981 to unmarried parents. Although Mario Rene Cabrera Cortez "declare[d]" himself to be Lopez's father by signing the birth certificate, Supp. JA 1290, Lopez claims he never lived with Cabrera Cortez and met him only a few times. When Lopez was 11, he was admitted to the United States as a lawful permanent resident to live with his mother, who had moved to this country two years earlier. When Lopez was 16, his mother became a naturalized U.S. citizen.

As an adult, Lopez was convicted of two state-law drug crimes and sentenced to ten years' imprisonment. A few years before Lopez's release, immigration officials interviewed him in prison. Their official case memorandum stated that Lopez "derived citizenship from his [U.S. citizen] mother as he was born out of wedlock and had not been legitimized by the father." Supp. JA 763.

2

Five years after Lopez was released from prison, however, the federal government initiated removal proceedings against him. Lopez moved to terminate the proceedings, arguing he automatically became a U.S. citizen when his mother naturalized and was thus ineligible for removal. That motion generated a series of orders by an immigration judge (IJ) and the Board of Immigration Appeals that eventually led to our review.

In 2017, the IJ issued an order denying Lopez's motion to terminate the removal proceedings. The IJ concluded Lopez could not "satisfy the requisite elements for derivative citizenship" because he "failed to meet his burden to demonstrate that his paternity was not legitimated under Salvadoran law." Supp. JA 1855.

In 2018, the IJ ordered Lopez removed to El Salvador. In that order, the IJ "incorporated" the earlier ruling that Lopez was not a U.S. citizen, Supp. JA 1124, concluded Lopez's criminal convictions rendered him removable, and denied his application for deferral of removal under the Convention Against Torture (CAT). Lopez appealed that decision to the Board.

In 2022, the Board dismissed Lopez's appeal in part and "remanded" to the IJ "for further proceedings and the entry of a new decision consistent with [the Board's] opinion." Supp. JA 1051. In that decision—which we will call the 2022 Remand Order—the Board "adopt[ed] and affirm[ed]" the IJ's 2017 decision that Lopez was not a U.S. citizen and "affirm[ed]" the IJ's 2018 ruling that he was "removable." Supp. JA 1050. But the Board concluded the IJ erred in handling Lopez's CAT claim and "remand[ed] the record for additional fact-finding and the entry of a new decision regarding [that] claim." *Id.*

On remand, the IJ again ordered Lopez removed and denied his request for relief

3

under the CAT. Lopez later claimed he did not receive a copy of the IJ's order and, as a result, did not immediately appeal it. In January 2023, immigration officials took Lopez into custody to execute the IJ's then-administratively final removal order. The next day, Lopez filed a motion asking the IJ to reopen his removal proceedings based on lack of notice. The IJ granted that motion and, on January 25, 2023, the IJ once again "found [Lopez] removable" and "re-entered" the removal order "as of th[at] date." Supp. JA 812. Seven months later, the IJ granted Lopez deferral of removal to El Salvador under the CAT. Both Lopez and the government appealed to the Board.

In its next decision—which we will call the 2024 Remand Order—the Board dismissed Lopez's appeal, sustained the government's appeal, and once again remanded to the IJ "for further proceedings consistent with [the Board's] opinion and entry of a new decision." Supp. JA 344. The Board concluded Lopez had "not established a reason to revisit" its previous ruling that he did not obtain derivative citizenship through his mother. Supp. JA 343. But the Board agreed with the government that the IJ had failed to adequately explain the decision to grant CAT relief and "remand[ed] the record for further proceedings on [Lopez's] application for deferral of removal under the CAT." Supp. JA 344. Lopez filed a petition for review of the 2024 Remand Order, which is docketed as No. 24-1208 in this Court.

On remand, the IJ again ordered Lopez removed to El Salvador and again granted deferral of removal under the CAT. Both sides appealed, and the Board dismissed the appeals in a decision we will call the 2025 Dismissal Order. In that order, the Board "reaffirm[ed]" its previous conclusion that Lopez was not a U.S. citizen. Supp. JA 11.

4

Lopez also petitioned for review of the 2025 Dismissal Order, which is docketed as No. 25-1076 in this Court. He is currently in immigration detention.[1]

## II.

The Immigration and Nationality Act authorizes us to review "final order[s] of removal." 8 U.S.C. § 1252(a)(1). The government and Lopez agree there is a final order of removal here but disagree about which of the Board's orders merit that description.

Having reviewed the record, this Court's precedent, and intervening Supreme Court authority, we conclude the Board's 2024 Remand Order was a final order of removal and that we have jurisdiction in No. 24-1208. We therefore deny the government's motion to dismiss that petition for review. We also conclude we have jurisdiction in No. 25-1076 because the Board's 2025 Dismissal Order expressly declined Lopez's request to reconsider the Board's previous conclusion that he is removable.

## A.

An order of removal is one "concluding that" a person "is deportable or ordering deportation." *Riley v. Bondi*, 606 U.S. 259, 267 (2025) (quoting 8 U.S.C. § 1101(a)(47)(A)). When, as here, an IJ makes the initial removability decision, such an order becomes "final" when the Board makes "a determination . . . affirming such order" or the time for seeking Board "review of such an order" expires, whichever happens first.

---

[1] Lopez also sought habeas relief in the United States District Court for the Eastern District of Virginia. The district court granted summary judgment to the respondents, see *Lopez v. Doe*, No. 1:23-cv-68, 2024 WL 4304837 (E.D. Va. Sep. 25, 2024), and Lopez appealed to this Court. That appeal (No. 24-6951) is being held in abeyance pending resolution of these consolidated petitions for review.

5

8 U.S.C. § 1101(a)(47)(B). Our threshold question is thus *when* the Board "affirm[ed]" the IJ's conclusion that Lopez is removable from the United States. *Id.*

We conclude the first final order of removal in this case was the Board's 2022 Remand Order. In 2018, the IJ ordered Lopez "removed from the United States to El Salvador," Supp. JA 1129, which was an order of removal. And in its 2022 Remand Order, the Board expressly "affirm[ed] the Immigration Judge's holding that" Lopez was "removable" under two provisions of the Immigration and Nationality Act. Supp. JA 1050. At that point, there was a final order of removal from which Lopez could have sought judicial review.

Lopez, of course, did not petition for review at that point. (To be fair, as we will explain later, the law in this area is in flux and this Court's then-existing precedent suggested such a petition would have been premature.) But we conclude there was a later, superseding final order of removal from which Lopez properly sought judicial review.[2]

On January 25, 2023, the IJ granted Lopez's motion to "reopen his removal proceedings," "vacate[d]" its earlier decision ordering Lopez removed from the United States, and issued a new order "as of th[at] date" finding that Lopez was "removable" and ordering his removal to El Salvador. Supp. JA 831 (first quote), 812–13 (second, third, and fourth quotes). By its terms, that decision was a new "order of removal" because it concluded Lopez was "deportable" and actually "order[ed]" his "deportation." *Riley*,

---

[2] Even if there were no superseding final order here, the 30-day time limit for filing a petition for review is not jurisdictional and is thus subject to both waiver and forfeiture. See *Riley*, 606 U.S. at 272–77.

6

606 U.S. at 267 (quotation marks removed). That new order, in turn, became final when the Board, in its 2024 Remand Order, declined to revisit its previous rulings and "dismissed" Lopez's appeal. Supp. JA 344.[3] We therefore have jurisdiction in No. 24-1208, which seeks review of the Board's 2024 Remand Order.

That leaves No. 25-1076, which seeks review of the 2025 Dismissal Order. On first view, that order does not seem to be a new final order of removal because—unlike in 2024—the IJ had neither granted a motion to reopen nor vacated its previous ruling that Lopez was removable from the United States. Compare Supp. JA 125–36, with Supp. JA 812–13. But even assuming that the 2025 Dismissal Order was not a final order of removal, we conclude we have jurisdiction because the Board denied Lopez's request to reconsider the previous orders of removal. The Immigration and Nationality Act "expressly contemplates" judicial "review of decisions refusing to reopen or reconsider" final orders of removal. *Mata v. Lynch*, 576 U.S. 143, 147 (2015) (citing 8 U.S.C. § 1252(b)(6)); see also 8 U.S.C. § 1252(b)(9). The Board's "reason" for denying such a request "makes no difference to the jurisdictional issue." *Mata*, 576 U.S. at 148. In its 2025 Dismissal Order, the Board once again rejected Lopez's claim that he derived U.S. citizenship through his mother and "reaffirm[ed]" its conclusion that he is removable from

---

[3] We do not hold that *any* reference to removability—or even a reiteration of the IJ's previous conclusion that Lopez was removable—would have been enough to make the IJ's January 25, 2023, order a new order of removal. Instead, our holding rests on the fact that the decision expressly vacated a previous decision ordering Lopez removed and "re-entered" a new order "as of th[at] date" that ordered his removal. Supp. JA 812. We also do not decide whether the Board's 2022 Remand Order actually authorized the IJ to reopen the removability question or how our analysis might have changed had the Board's 2024 Remand Order concluded the IJ had not been permitted to do so.

the United States. Supp. JA 11. That is enough to permit our review in No. 25-1076 as well.

B.

Despite agreeing we have jurisdiction in No. 25-1076, the government sees things quite differently. In its view, the *only* final order of removal here is the 2025 Dismissal Order and we must dismiss the petition for review of the 2024 Remand Order (No. 24-1208) for lack of jurisdiction. In so arguing, the government relies heavily on *Kouambo v. Barr*, 943 F.3d 205 (4th Cir. 2019). Although we agree that decision supports the government's position, we conclude intervening Supreme Court authority has abrogated *Kouambo*'s holding and reasoning.

The relevant facts of *Kouambo* are much like those here. An IJ concluded a noncitizen was removable and denied his asylum application but nonetheless granted withholding of removal. See *Kouambo*, 943 F.3d at 208. The noncitizen appealed the denial of his asylum application to the Board, which dismissed the noncitizen's appeal but remanded to the IJ for additional proceedings related to the grant of withholding of removal. See *id.* at 209. Without waiting "for the IJ to issue an order on remand," the noncitizen immediately petitioned for judicial review of the Board's decision. *Id.*

This Court concluded there was no "final order of removal" and dismissed the petition for review "on jurisdictional grounds." *Kouambo*, 943 F.3d at 207, 209 (quotation marks removed). Our opinion gave two primary reasons for this conclusion. First, the Court stated that the jurisdictional statute's "use of the term 'final' counsels against concluding that an order of removal can be subject to judicial review prior to the conclusion of all substantive proceedings on remand." *Id.* at 212. Second, the Court reasoned that permitting

8

judicial review while proceedings were still ongoing before the IJ "would require us to resolve these cases in fits and starts," thus sacrificing "judicial efficiency" and creating a bifurcated system of judicial review in which noncitizens may not be able to effectively challenge decisions like the denial of withholding of removal. *Id.* at 211 (quotation marks removed); see *id.* at 213–14.

We take the government's point that *Kouambo* suggests we lack jurisdiction in No. 24-1208 because the Board's 2024 Remand Order contemplated further substantive proceedings about Lopez's request for CAT relief. But we conclude that *Kouambo*'s holding and reasoning cannot be squared with—and have thus been abrogated by—the Supreme Court's later decisions in *Nasrallah v. Barr*, 590 U.S. 573 (2020), and *Riley v. Bondi*, 606 U.S. 259 (2025).

Standing alone, *Nasrallah* would not have been enough to abrogate *Kouambo*. See *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (describing the "high bar" for concluding that circuit precedent has been "overrule[d] or abrogate[d]" by intervening Supreme Court authority); cf. *Garcia v. Garland*, 73 F.4th 219, 228 n.5 (4th Cir. 2023) (reiterating *Kouambo*'s jurisdictional rule after *Nasrallah* but before *Riley*, though without discussing *Nasrallah*). The disagreement between the parties in *Nasrallah* did not involve the meaning of "final order of removal," or when or how a noncitizen may seek judicial review of a removability determination. Instead, it involved "the scope of judicial review of CAT orders for . . . noncitizens who have committed" certain crimes and whether that scope incorporates limits Congress has placed on judicial review of the underlying removability determination. *Nasrallah*, 590 U.S. at 576.

9

That said, much of the Supreme Court's reasoning in *Nasrallah* is hard to square with this Court's reasoning in *Kouambo*. Whereas *Kouambo* focused on "the agency's decisionmaking process" as a whole, 943 F.3d at 213 (quotation marks removed), *Nasrallah* was careful to distinguish between proceedings about removability (which culminate in a final order of removal) and other proceedings. *Nasrallah* emphasized that "[a] CAT order is not itself a final order of removal because it is not an order 'concluding that the alien is deportable or ordering deportation.'" 590 U.S. at 582 (quoting 8 U.S.C. § 1101(a)(47)(A)). The Court also stated that a CAT order neither "disturb[s]" nor "affect[s] the validity of the final order of removal" because it does not prevent a noncitizen from being removed from the United States. *Id.* That reasoning undermines this Court's conclusion in *Kouambo* that there can be no "final order of removal" until "the conclusion of all substantive proceedings on remand." *Kouambo*, 943 F.3d at 212; accord *Kolov v. Garland*, 78 F.4th 911, 927–28 (6th Cir. 2023) (Murphy, J., concurring) (concluding *Nasrallah* and a 2021 Supreme Court decision "seemingly reject" the reasoning of decisions like *Kouambo*).

To be sure, *Kouambo* identified another justification for its holding: the desirability of consolidating all judicial review of agency action into a single proceeding. See *Kouambo*, 943 F.3d at 211–14. And "when a Supreme Court decision abrogates one portion of our rationale in a prior case but not another, the rationale not abrogated by the Supreme Court" continues to "bind[] future panels." *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019). But we conclude the Supreme Court's even more recent decision in *Riley* abrogated the portions of *Kouambo*'s reasoning that survived *Nasrallah*.

10

Unlike *Nasrallah*—and like this case—*Riley* directly involved the meaning of the words "final order of removal." *Riley*, 606 U.S. at 263 (quoting 8 U.S.C. § 1252(b)(1)); accord *id.* at 266–72. Echoing this Court's reasoning in *Kouambo*, the parties in *Riley* identified various "practical problems" that would "arise if a removal order becomes final before the issue of withholding-only relief is decided." *Id.* at 271; cf. *Kouambo*, 943 F.3d at 213–14. The Supreme Court rejected those arguments, emphasizing both the need to "follow the statutory text" and identifying various ways to address the "legitimate practical concerns" the parties had identified. *Riley*, 606 U.S. at 272. The Court also reiterated that "[t]he finality of the order of removal . . . does not depend in any way on the outcome of" a later-concluded "withholding-only proceeding." *Id.* at 269 (alterations and quotation marks removed).

We acknowledge the differences between the administrative processes underlying *Riley* and those involved here. In *Riley*, a noncitizen reentered the country after being removed and was subject to expedited removal proceedings in which his removal order was issued by the Department of Homeland Security and could not be challenged in proceedings before the IJ or the Board (both of which are housed in the Department of Justice). See 606 U.S. at 264, 267. Here, in contrast, Lopez is in "ordinary removal proceedings," which afford him the opportunity to contest removability before the IJ and the Board. *Kolov*, 78 F.4th at 924 (Murphy, J., concurring).

That said, we see no way to read *Riley*'s rejection of the efficiency- and fairness-based arguments made in that case "harmoniously," *Taylor*, 930 F.3d at 619 (quotation marks removed), with this Court's reasoning in *Kouambo*—much less the portions of

11

*Kouambo*'s reasoning that remained good law after *Nasrallah*. Cf. *Riley*, 606 U.S. at 269 (referencing "the lessons taught by *Nasrallah*"). Thus, while "we do not lightly presume that the law of this circuit has been overturned," *Doe v. Sidar*, 93 F.4th 241, 245 (4th Cir. 2024) (alterations and quotation marks removed), we conclude that high bar is satisfied here. We hold that *Nasrallah* and *Riley* abrogated *Kouambo* and therefore deny the government's motion to dismiss No. 24-1208.[4]

### III.

We now arrive at the merits question: Did Lopez automatically become a U.S. citizen when his mother naturalized? We have jurisdiction to review that "question[] of law." 8 U.S.C. § 1252(a)(2)(D). And because we conclude there are no genuine issues of material fact, we can—and must—decide the issue for ourselves. See § 1252(b)(5)(A) ("If the petitioner claims to be a national of the United States and the court of appeals finds . . . that no genuine issue of material fact about the petitioner's nationality is presented, the court *shall* decide the nationality claim." (emphasis added)). Applying the traditional tools of statutory construction, we conclude Lopez is a U.S. citizen. We therefore grant the petitions for review, vacate the underlying orders, and remand with instructions to terminate the removal proceedings against him. See, *e.g.*, *Ng Fung Ho v. White*, 259 U.S.

---

[4] We recognize that our holding represents a major change about when some immigrants seeking CAT relief will need to file an initial petition for review, but that does not mean we will need "to resolve these cases in fits and starts." *Kouambo*, 943 F.3d at 211. Rather, as the Supreme Court explained in *Riley*, even when a person files an immediate petition for review from a final order of removal, this Court can await the conclusion of any "withholding-only proceedings" and decide all issues at once. 606 U.S. at 272; see 8 U.S.C. § 1252(b)(9) (zipper clause).

276, 284 (1922); *Johnson v. Whitehead*, 647 F.3d 120, 125 (4th Cir. 2011); cf. *Frank v. Rogers*, 253 F.2d 889, 890 (D.C. Cir. 1958) ("Until the claim of citizenship is resolved, the propriety of the entire proceeding is in doubt.").

### A.

The parties agree the relevant derivative-citizenship statute is the one in effect when Lopez's mother naturalized in 1998. See *Jahed v. Acri*, 468 F.3d 230, 234–35 (4th Cir. 2006) (analyzing a petitioner's citizenship claim under a then-repealed statute that had been in effect when the relevant parent naturalized); cf. *Duarte-Ceri v. Holder*, 630 F.3d 83, 87 (2d Cir. 2010) ("To determine whether a petitioner obtains derivative citizenship, the court applies the law in effect when [the] petitioner fulfilled the last requirement to qualify." (alterations and quotation marks removed)). Because we will return to that statute's provisions several times, we begin by quoting it in full:

> A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
>
> (1) The naturalization of both parents; or
>
> (2) The naturalization of the surviving parents if one of the parents is deceased; or
>
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
>
> (4) Such naturalization takes place while such child is unmarried and under the age of eighteen years; and
>
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently

13

in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (1952).[5]

The parties agree about most of the relevant questions under this statute. They agree Lopez was born outside the United States to parents who were then both noncitizens. They agree subsections (1) and (2) are inapplicable because only Lopez's mother naturalized and nothing in the record suggests his biological father is deceased. They also agree that Lopez's parents were never married, which makes subsection (3)'s first clause inapplicable. Cf. *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003) (concluding subsection (3)'s first clause could not apply to a petitioner whose "natural parents never married and thus could not legally separate" (emphasis removed)). For that reason, only subsection (3)'s second clause remains in play. Further narrowing our inquiry, the parties agree Lopez was born of out wedlock and that he satisfies subsections (4) and (5) because he was unmarried, less than 18 years old, and a lawful permanent resident when his mother naturalized.

So narrowed, this case comes down to a single controlling question: When Lopez's mother became a naturalized U.S. citizen in 1998, had his "paternity . . . been established by legitimation" within the meaning of those terms in the then-governing federal statute? We hold that it had not and that Lopez is therefore a U.S. citizen.

As always, we start with the statutory text. For Lopez to have automatically become

---

[5] This statute was repealed in 2001 and replaced by a new one establishing different rules for obtaining derivative citizenship. See Child Citizenship Act of 2000, Pub. L. No. 106–395, §§ 101 & 103(a), 114 Stat. 1631, 1631–33 (2000).

a citizen when his mother naturalized, the relevant text instructs that a certain thing ("the paternity of the child") must not yet have "been established" in a certain way ("by legitimation"). 8 U.S.C. § 1432(a)(3) (1952). The question is not whether the identity of Lopez's biological father was known when his mother naturalized or whether his birth had been deemed 'legitimate' (as opposed to 'illegitimate') for some—or even all—purposes. Instead, the question is whether Lopez's paternity had then been established *by legitimation*.

When the relevant statute was enacted, as now, the word "by" meant "through the medium of," "via," or "through the agency or instrumentality of." *By*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/by [https://perma.cc/4ETH-YSMG] (citations removed). Congress's use of "by" thus shows "that legitimation must be the *means* through which paternity was established." *Flores-Torres v. Holder*, 680 F. Supp. 2d 1099, 1105 (N.D. Cal. 2009) (emphasis added).

To be sure, when Lopez was born, Mario Rene Cabrera Cortez signed the birth certificate. But even assuming that act "established" Lopez's "paternity," we cannot see—nor does the government explain—how signing a birth certificate establishes paternity "by" a process United States law would have called "legitimation" when the relevant statute was enacted in 1952. Cf. S. Rep. No. 81-1515, at 692–93 (1950) ("As a general proposition, legitimation is accomplished by the marriage of the parents with acknowledgment of

15

paternity by the putative father.").[6] That alone is fatal to the government's position.

B.

The government launches a flurry of counterarguments. We are unpersuaded.

1.

Relying on *Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630 (1967), the government insists it is Lopez's "burden to prove that he is a U.S. citizen" and that "any doubts should be resolved in favor of" the government and against him. Gov't Br. 15–16 (quotation marks removed). It is, at minimum, unclear whether that principle applies here. This is not "a naturalization case" and Lopez is not a "moving party" who is "affirmatively" seeking relief in these proceedings. *Berenyi*, 385 U.S. at 636–37. Instead, Lopez claims he is *already* a U.S. citizen and that the government is wrongfully threatening to remove him despite that fact.

At any rate, we conclude it does not matter which side bears the burden of proof of showing Lopez is or is not a U.S. citizen. The role of a burden of proof is to assign responsibility for proving or disproving material *facts* that bear on the proper resolution of a dispute. See, *e.g.*, *Smith v. United States*, 568 U.S. 106, 112 (2013) ("Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof." (alterations and quotation marks removed)). Here there is no dispute about what happened or whether the evidence that exists is enough to show that an

---

[6] We do not hold that a later marriage is the only possible way to establish "paternity . . . by legitimation" under former Section 1432(a)(3). Instead, our decision turns on the absence of *any* act that established Lopez's paternity by legitimation.

16

established legal standard (for example, "reasonable care") has been satisfied. Instead, the parties disagree about what the statutory words "the paternity of the child has not been established by legitimation" *mean*. That is a purely legal question about which we must exercise our own "independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

2.

The government's next set of arguments involve an exegesis of Salvadoran family law. The government starts by defining legitimation as "the act of placing a child born out of wedlock in the same legal position as a child born in wedlock." Gov't Br. 18 (quoting *Matter of Moraga*, 23 I. & N. Dec. 195, 197 (B.I.A. 2001) (en banc)). It next states that in 1983—two years after Lopez was born but 15 years before his mother naturalized— El Salvador adopted a new constitution providing that *all* "children born in and out of wedlock have equal rights." *Id.* at 19. The government further represents that, under Salvadoran law, "paternity can be established by voluntary recognition, including on the birth certificate of the child." *Id.* at 19–20 (alterations and quotation marks removed). "Because Mr. Lopez's father acknowledged paternity on [Lopez's] birth certificate," the government insists Lopez automatically became "a legitimate child" when the new Salvadoran constitution was adopted in 1983. *Id.* at 20.

We may assume—solely for the sake of argument—that the government is right about everything in the previous paragraph. Even so, the government's argument that those changes in Salvadoran law bar Lopez from citizenship cannot be squared with the language Congress chose.

17

We begin by emphasizing that our task is to interpret and apply the laws of the United States. Like any other sovereign, El Salvador is free to keep, change, or abolish legal distinctions between children born to married and unmarried parents, as well as create rules for how a child's paternity is determined for purposes of its own law. But whether Lopez's "paternity" had or had not "been established by legitimation" under former Section 1432(a)(3) "is not ultimately governed by the law of [El Salvador], whatever that may be." *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98 (2002). As always, the meaning of terms used in a federal statute and how that meaning applies in a particular situation are "matter[s] of federal law," not Salvadoran law. *United States v. National Bank of Com.*, 472 U.S. 713, 727 (1985).

The government reads former Section 1432(a)(3) as imposing two separate requirements—paternity and legitimation—that together rendered Lopez ineligible for automatic citizenship. But that is not what the statute said. The statute did not say Lopez was ineligible for citizenship so long as his paternity had been established *and* his out-of-wedlock birth had later been legitimized. Instead, it said Lopez automatically became a U.S. citizen when his mother naturalized so long his as his "paternity . . . ha[d] not been *established by legitimation*." 8 U.S.C. § 1432(a)(3) (1952) (emphasis added). Even if Cabrera Cortez's signature on the birth certificate established Lopez's "paternity" under either U.S. or Salvadoran law, it did not do so via or through a process of "legitimation." And even if later changes to Salvadoran law rendered Lopez's birth "legitimate" in some general sense, those changes "did not, of [their] own force, establish [Lopez's] *paternity*." *Lainez v. Bondi*, 141 F.4th 393, 402 (2d Cir. 2025) (emphasis added).

18

The government's contrary arguments either ignore the statutory text or change "Congress's chosen language in some material way." *Julmice v. Garland*, 29 F.4th 206, 208 (4th Cir. 2022).[7]

3.

Plunging ahead, the government insists our sister circuits "widely agree with" it (and its reading of the Board's precedent) "on this issue." Gov't Br. 21. Not so. Each case the government cites had materially different facts, interpreted materially different statutory language, and/or was decided before the Supreme Court instructed federal courts not to defer to administrative agencies like the Board about questions of statutory interpretation. See *Solis-Florez v. Bondi*, 159 F.4th 205, 211 (4th Cir. 2025) (stating that, after *Loper Bright*, "we no longer defer to the Board's interpretation" of statutory terms).

Take the first case the government cites, the Ninth Circuit's decision in *Romero-Mendoza v. Holder*, 665 F.3d 1105 (9th Cir. 2011). See Gov't Br. 21 (describing *Romero-Mendoza* as "[p]articularly persuasive"). The government claims that "[t]he *only*

---

[7] At points, the government suggests that the 1983 Salvadoran constitution's elimination of all distinctions between children born to married and unmarried parents was itself sufficient to disqualify Lopez from derivative citizenship. That argument drifts even further from the statutory text by eliminating the need to establish a child's "paternity" via *any* means. But see *Lainez*, 141 F.4th at 401 ("When Congress enacted the [Immigration and Nationality Act] in 1952, it knew how to write provisions . . . such that certain immigration consequences follow from a child merely being 'legitimated.'" (citing other provisions of the Act)). When asked about this problem, the government responded that "El Salvador has already taken that part"—*i.e.*, the need to establish paternity—"out of it for us" by abolishing any distinctions between 'legitimate' and 'illegitimate' children. Oral Arg. 28:52–:57. We return to the point we made earlier: Former Section 1432(a)(3) was a law of the United States, and the government of El Salvador had no power to add to or subtract from its requirements.

difference" between that case and Lopez's is that, in *Romero-Mendoza*, the petitioner's "parents ultimately married." *Id.* at 21 n.11 (emphasis added). But that difference is critical. In *Romero-Mendoza*, the "parents' subsequent marriage prior to [the petitioner's] mother's naturalization" *was* what "established [his] paternity by legitimation." 665 F.3d at 1108. Here, there was no such marriage.

Other decisions cited by the government involved materially different statutory language. For example, two involved a provision of the Immigration and Nationality Act that asked whether a child was "legitimate" or had been "legitimated" rather than whether the child's paternity had been established by legitimation. *De Los Santos v. Immigration & Naturalization Serv.*, 690 F.2d 56, 58–60 (2d Cir. 1982); *Lau v. Kiley*, 563 F.2d 543, 544–46 (2d Cir. 1977). And two other decisions involved a statutory provision whose text—unlike this one's—made clear that whether a person had been "legitimated under the law of the person's residence or domicile" and whether that person's "paternity" had been established were separate requirements that could be satisfied in different ways. 8 U.S.C. § 1409(a)(4) (1964); see *Iracheta v. Holder*, 730 F.3d 419, 423 (5th Cir. 2013) (construing that provision); *Anderson v. Holder*, 673 F.3d 1089, 1097 (9th Cir. 2012) (same).

The government cites three other decisions that involved the same statute we address here. But two of those cases were decided before *Loper Bright* and thus deferred to the Board's understanding of the relevant legal framework. See *Miranda v. Sessions*, 853 F.3d 69, 74 (1st Cir. 2017); *Brandao v. Attorney Gen.*, 654 F.3d 427, 430 (3d Cir. 2011). The final decision—*Colin-Villavicencio v. Garland*, 108 F.4th 1103 (9th Cir. 2024)—was argued seven months before *Loper Bright* issued and decided only a month

20

later. And in that decision, the Ninth Circuit relied on its own pre-*Loper Bright* decisions that had themselves deferred to the Board and repeatedly noted that the petitioner before it "never disputed that her father's paternity had been established by legitimation." *Colin-Villavicencio*, 108 F.4th at 1114; see *id.* at 1112–13 (citing *Romero-Mendoza* and *Anderson*); see also *Loper Bright*, 603 U.S. at 412 (emphasizing pre-*Loper Bright* decisions remain binding as a matter of "statutory *stare decisis*"). Those three decisions are therefore of limited value here.

In contrast, we could not agree with the government's position without *creating* a circuit split. In *Lainez v. Bondi*, 141 F.4th 393 (2d Cir. 2025), the Second Circuit rejected the same argument the government makes here and held the changes to Salvadoran law that abolished all legal distinctions between children born to married and unmarried parents "did not establish [the petitioner]'s paternity by legitimation." *Id.* at 400. The government argues *Lainez* is distinguishable because there the petitioner's mother naturalized *before* the Salvadoran civil code was amended to confirm that signing a child's birth certificate is a valid way of establishing paternity whereas here Lopez's mother naturalized *after* that change. But—for a final time—even assuming the government's claims about Salvadoran law are true, that would not matter. The issue before us is not whether, under the laws of El Salvador, Lopez is a "legitimate" child whose "paternity" has been established in some way. Rather, it is whether his "paternity" has or "has not been established *by legitimation*" under the governing federal statute. 8 U.S.C. § 1432(a)(3) (1952) (emphasis added).

4.

The government's final argument is that construing this since-repealed statutory

21

provision as meaning what it said would deprive that provision of real-world impact in many situations. The government represents that many jurisdictions—not just El Salvador—have abolished the traditional legal distinctions between 'legitimate' and 'illegitimate' children and have also eliminated any legal mechanism for establishing a child's paternity by legitimation. In such jurisdictions, the government asserts that following the statutory text would defeat the statute's "whole purpose" by leaving an unmarried, noncitizen father with no way of protecting his parental rights by preventing his child's naturalization as a U.S. citizen. Oral Arg. 25:38–26:05.

That argument reprises a tactic the Supreme Court has repeatedly rejected. "[N]o amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021). "[I]t is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). Rather, "our job" is "to apply faithfully the law Congress has written." *Id.*

Here, "it is entirely possible that Congress wrote a law in 1952 that assumed a world in which 'illegitimate' children had to be 'legitimated,' and as the world moved away from those distinctions, our law was a little slow to catch up." *Lainez*, 141 F.4th at 403. But we have no license to ignore the text of the law that Congress enacted and speculate about what Congress would have wanted had it considered the possibility that some (or even many) jurisdictions may later abolish all legitimacy-based distinctions. See *Henson*, 582 U.S. at 89. It is no more "a proper function of *interpretation* (as opposed to

22

amendment) to ensure" that every limitation that Congress placed on derivative citizenship continues to apply to every country (no matter how that country alters its own family law) than it is to ensure "that every development in foreign law has a corresponding benefit under U.S. law." *Wedderburn v. Immigration & Naturalization Serv.*, 215 F.3d 795, 798 (7th Cir. 2000). Instead, we "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). And based on what Congress said here, Lopez automatically became a U.S. citizen when his mother naturalized.

*        *        *

The motion to dismiss No. 24-1208 for lack of jurisdiction is denied. The petitions for review are granted, the Board's orders are vacated, and the matter is remanded with instructions to terminate Lopez's removal proceedings.

*SO ORDERED*